**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Zack Hearrell,<br>Plaintiff,<br>v.<br>Pro Motorsports Group Limited, et al.,<br>Defendants. | No. CV-25-00440-PHX-DWL<br>**ORDER** |
| Pro Motorsports Group Limited, et al.,<br>Counter Claimants,<br>v.<br>Zack Hearrell, et al.,<br>Counter Defendants. | |

In this action, Plaintiff Zack Hearrell ("Hearrell") asserts claims against Defendants Pro Motorsports Group Limited, Promotorsports, James Lewis, Susan Lewis, and Pro Motorsports LLC (together, "Promotorsports") for unpaid wages under the Fair Labor Standards Act ("FLSA"), the Arizona Minimum Wage Act ("AMWA"), and the Arizona Wage Act ("AWA"). (Doc. 1.) In turn, Promotorsports[1] has asserted various federal and

[1] The counterclaims have been brought only by Pro Motorsports Group Limited, Promotorsports, James Lewis, and Susan Lewis because, as the counterclaims allege, "Pro Motorsports, LLC, is an Arizona limited liability company unrelated to any Defendant or Counterclaimant" and "is not a proper party to this lawsuit." (Doc. 32 ¶ 1.) Because the analysis in this order does not turn on whether Pro Motorsports, LLC is a proper party, this order will also refer to counterclaimants, together, as "Promotorsports."

state-law counterclaims against Hearrell and a limited liability company through which Hearrell allegedly operated, Hero Wholesale, LLC ("Wholesale"). (Doc. 32.)

Now pending before the Court is Hearrell's Rule 12(b)(1) motion to dismiss counterclaims two through seven (i.e., the state-law counterclaims) for lack of subject-matter jurisdiction. (Doc. 33.) The motion is now fully briefed. (Docs. 37, 39.)[2] For the reasons that follow, the motion is denied.

**BACKGROUND**

I. <u>Hearrell's Complaint</u>

The factual allegations set forth below, which are presumed true for the purposes of the pending motion, are derived from Hearrell's complaint. (Doc. 1.)

"[Promotorsports] is an enterprise that is a custom automobile builder and vehicle dealership doing business in the Phoenix Metropolitan area." (*Id.* ¶ 43.) Before the events giving rise to this action, Hearrell "worked for [Promotorsports] for approximately 20 years before leaving the company." (*Id.* ¶ 44.)

"In or around 2021, [Hearrell] returned to work for [Promotorsports]." (*Id.* ¶ 45.) During this period, Hearrell "worked for [Promotorsports] as a general manager." (*Id.* ¶ 47.) Hearrell was "compensated, or supposed to be compensated, at an hourly rate of $25 per week, plus commission of 50 percent of the profit derived from a given sale he made." (*Id.* ¶ 48.) Throughout this time, "[Promotorsports] generally paid [Hearrell] on a weekly basis." (*Id.* ¶ 49.) Hearrell "typically worked approximately between 38 and 48 hours or more per week." (*Id.* ¶ 52.)

"[Hearrell] worked for [Promotorsports] through approximately January 28, 2025," when he was ultimately terminated. (*Id.* ¶ 51. *See also id.* ¶ 46.) Hearrell's "final workweek took place between approximately January 22, 2025, and January 28, 2025." (*Id.* ¶ 53.) "In [Hearrell's] final workweek, he worked approximately 20 hours for [Promotorsports]." (*Id.* ¶ 54.) Promotorsports "did not pay [Hearrell] any wages

---

[2] Promotorsports's request for oral argument is denied because the issues are fully briefed and oral argument will not aid the decisional process. *See* LRCiv 7.2(f).

whatsoever for [his] final workweek." (*Id.* ¶ 55.) As a result, the complaint alleges that Promotorsports "failed to compensate Plaintiff at least the statutory minimum wage for all hours worked in his final workweek." (*Id.* ¶ 57.)

In addition, Hearrell also "earned commissions in excess of approximately $80,000," but Promotorsports "did not pay any wages or commissions whatsoever to [him] for such time worked." (*Id.* ¶¶ 60-61.) Specifically, Promotorsports "failed to pay the following full or partial commissions due and owing to [Hearrell] for sales he made: a. Approximately $150 for a Chevrolet Chevelle sale on or about December 2, 2024; b. Approximately $3,200 for a vehicle sale on or about March 4, 2024; c. Approximately $75,000 for a boat sale on or about March 5, 2024; [and] d. Approximately $5,000 for a truck sale on or about March 5, 2024." (*Id.* ¶ 62.) "Rather than paying [Hearrell]" these "wages and commissions," Promotorsports "terminated" Hearrell and "refused to pay him." (*Id.* ¶ 63.)

Based on these allegations, Hearrell asserts three claims: (1) failure to pay minimum wage in violation of the FLSA; (2) failure to pay minimum wage in violation of the AMWA; and (3) failure to pay wages due and owing in violation of the AWA. (*Id.* ¶¶ 75-89.)

II. <u>Promotorsports's Counterclaims</u>

Promotorsports asserts seven counterclaims against Hearrell and Wholesale. (Doc. 32.) The factual allegations giving rise to those counterclaims, which are presumed true for purposes of the pending motion, are as follows:

"[B]eginning in 2021, up to and ending on or about January 28, 2025," Hearrell worked for and was "paid directly by Promotorsports." (*Id.* ¶ 2.) Wholesale "is an Arizona limited liability company" and "is the entity to which Hearrell instructed that payments for his work . . . be paid." (*Id.* ¶ 3.) Promotorsports made payments, "primarily via Zelle, but on occasion by check," to Wholesale for Hearrell's work. (*Id.* ¶ 11.) "On one occasion, Hearrell instructed that a $15,000 payment be made to 'Creative Collective, LLC,' on June 4, 2024, via check, which Promotorsports did." (*Id.* ¶ 12.)

"Over the course of at least two years, and continuing into 2025, and even after Hearrell's termination, Hearrell committed the following acts, through which payments were generally made via Zelle, or similar wire and payment transfers, to Wholesale." (*Id.* ¶ 13.)

On September 6, 2022, "C.C. paid Hearrell $900 in cash" for car parts that "C.C. ordered from Promotorsports," including "a custom steering wheel, tires, and wheels." (*Id.* ¶ 19.) "C.C. picked up the steering wheel, tires and wheels from [Promotorsports's] shop." (*Id.*) Promotorsports "only learned of this at about the time when Hearrell's relationship with [Promotorsports] ended, as [Promotorsports] began investigating Hearrell's misconduct and prior activities." (*Id.*) "The steering wheel cost Promotorsports $750, the two tires $771.45, the three wheels $540.40." (*Id.*) "Hearrell instructed C.C. to pay Wholesale between $2,800 and $3,800." (*Id.*)

On March 20, 2024, "[p]rofessional athlete M.R. made a payment to Wholesale at Hearrell's instruction, via Zelle, . . . of $2,000, and another on April 1, 2024, of $2,000, for a rollbar that was sold and installed by, and for the intended benefit of, Promotorsports. This payment instead benefited Wholesale and Hearrell." (*Id.* ¶ 20.)

On May 7, 2024, "Hearrell offered D.D. a discount on a payment owing to Promotorsports, if D.D. were to send the payment via Zelle to Wholesale. The discount offered was between $500 and $1000, for charges totaling $2,000 and $3,000. . . . D.D. had also, prior to that payment and at the instruction of Hearrell, sent $4,000 to Wholesale. This payment benefited Wholesale and Hearrell." (*Id.* ¶ 15.) That same day, "D.D. paid Wholesale, via Zelle, . . . for products or services provided by Promotorsports at Hearrell's instruction. This was for a repair to a scratch on the side of his vehicle, which [Promotorsports] had already agreed to do for free in order to develop and continue goodwill with the customer." (*Id.* ¶ 16.)

On or about January 6, 2025, "W.B. sent Wholesale, at Hearrell's instruction, $3,500 for services or products provided by or on behalf of Promotorsports. This payment benefited Wholesale and Hearrell. . . . Hearrell instructed W.B. to pay Wholesale by credit

card." (*Id.* ¶ 18.)

On January 8, 2025, "Promotorsports paid Vicrez.com, LLC the amount of $1,705.50 for auto parts that Hearrell directed to W.B. and for which Wholesale received payment from W.B." (*Id.* ¶ 21.)

On January 23, 2025, "Hearrell had professional athlete W.B. send to Wholesale, via Zelle, a payment of $650 for work performed by or on behalf of Promotorsports." (*Id.* ¶ 17.) That same day, "Hearrell also had Promotorsports pay $4,000 to Sound Wave Customs for product that was then provided to W.B. with payments going to Wholesale. This payment benefited Wholesale and Hearrell." (*Id.* *See also id.* ¶ 21.)

On or about February 25, 2025, "[p]rofessional sports coach M.B. . . . was instructed by Hearrell to send, via Zelle, to Wholesale $3,200 for its use and benefit, as evidenced by text messages between the two. This is money for services or products that were provided by and for the benefit of Promotorsports. . . . This was after Hearrell's association with [Promotorsports] ended." (*Id.* ¶ 14.)

"Hearrell also acted in concert with non-party, Samuel Osterkorn ('Osterkorn')," who previously worked for Promotorsports during a period where Hearrell was also working for Promotorsports. (*Id.* ¶¶ 24-25.) "Osterkorn was sued in a separate proceeding for similar acts and omissions . . . in Maricopa County, Arizona, Superior Court lawsuit CV2025-26650," and "[a] judgment has been entered against him." (*Id.* ¶ 26.) "Osterkorn also is the subject of Maricopa County Criminal charges, case number 2076253, Court Number CR2025-007014-001, and report number 2414748 from the Scottsdale Police Department," and "on information and belief, . . . Hearrell may be involved in some manner with Osterkorn's activities." (*Id.* ¶ 27.) "Hearrell, separately, and in conjunction with Osterkorn, directed J.R., a long-time, repeat customer/client, away from [Promotorsports] to pay a non-party entity a $600,000 payment for goods and services that were never provided by Hearrell nor anyone. That payment was made to a third, non-party entity which, in turn, then paid Hearrell $100,000." (*Id.* ¶ 29.) "J.R. did not receive the purchased vehicle." (*Id.*)

"Hearrell's activities targeted professional athletes and coaches, and other persons with a certain level of wealth." (*Id.* ¶ 30.)

"Hearrell also misused [Promotorsports's] credit cards for entirely personal reasons, unrelated to [Promotorsports's] business activities." (*Id.* ¶ 32.)

"On one Promotorsports business charge card, Hearrell made $8,052.35 in unauthorized purchases between May 17, 2024, and December 31, 2024, alone. Hearrell made 74 separate unauthorized transactions, from Shell service stations, Chevron service stations, T-Mobile, Amazon, Wendy's, Jimmy John's, Taco Bell, Olive Garden, Dutch Bros, and Jersey Mike's, among other places." (*Id.* ¶ 33.) At various times, "Hearrell would also obtain cash back." (*Id.*) "In particular, for example, Hearrell charged more than $300 to multiple gas stations on a single day, January 17, 2025," and "[t]his type of single-day activity occurs on several occasions." (*Id.*) "Many purchases occurring in December 2024 appear to be for personal Christmas gifts, again for Hearrell's own personal benefit or that of Wholesale." (*Id.* ¶ 34.)

"From October 6, 2024, to January 24, 2025, Hearrell charged $21,733.36 on a separate Promotorsports card, on 117 separate charges." (*Id.* ¶ 35.) "One of these charges is from February 12, 2025, at Stay Dripped IV in Cheyenne, Wyoming, in the amount of $630.00." (*Id.*) "Not only was this charge unauthorized, but Hearrell used the card on this occasion after his association with [Promotorsports] ended." (*Id.*)[3]

On January 8, 2025, "Hearrell charged a battery and other items totaling $550.03, to a [Promotorsports] business card at O'Reilly Auto Parts and used these items for his or Wholesale's purposes." (*Id.* ¶ 22.) "This was not an authorized transaction that benefited [Promotorsports]." (*Id.*)

On February 7, 2025, "Hearrell purchased for the use and benefit of him and Wholesale more items from O'Reilly Auto Parts, including a battery and head lamp, using a [Promotorsports] business card in the amount of $583.68. This was after his separation

[3] The counterclaims attach, as Exhibit A, a "list of the more recently discovered unauthorized charges." (Doc. 32 ¶ 35; Doc. 32-1 [Exhibit A].)

from his association with [Promotorsports]. It was not authorized activity." (*Id.* ¶ 23.)

"All acts and omissions" by Hearrell "were not authorized and were for the sole use and benefit of Hearrell or Wholesale." (*Id.* ¶ 36.) "These unauthorized charges were discovered only after [Promotorsports] initiated a more in-depth look into Hearrell's history after receiving information from customers disclosing that Hearrell would accept payments directly to Wholesale for [Promotorsports's] goods or services. This discovery occurred in early 2025 and led to the termination of Hearrell's . . . relationship with [Promotorsports]." (*Id.*) "All the above acts and omissions were part of a plan or scheme intended to defraud [Promotorsports] and were accomplished through the interstate use of money transfers, charges, and other wire transactions for intentional and fraudulent purposes." (*Id.* ¶ 37.)

Last, while working for Promotorsports, "Hearrell also had access and use of vehicles for a fee. As to some of these vehicles, he returned them damaged or with a diminished value due to his use of them. He did not pay agreed upon amounts owing from the rentals or for damages and diminished value to these high-end vehicles. The amount owed for this exceeds $125,000." (*Id.* ¶ 38.)

Based on these allegations, Promotorsports asserts the following seven counterclaims: (1) federal RICO; (2) Arizona Unlawful Acts; (3) breach of fiduciary duty; (4) unjust enrichment; (5) conversion; (6) fraud; and (7) breach of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 39-81.)

III. <u>Procedural History</u>

On February 8, 2025, Hearrell, through counsel, initiated this action. (Doc. 1.)

On March 19, 2025, Promotorsports answered the complaint. (Doc. 17.)

On November 17, 2025, Promotorsports filed counterclaims against Hearrell and Wholesale. (Doc. 24.)

On January 7, 2026, Promotorsports filed amended counterclaims. (Doc. 32.)[4]

On January 28, 2026, Hearrell, through counsel, filed a Rule 12(b)(1) motion to

---

[4] This order refers to the amended counterclaims as the "counterclaims."

dismiss only Promotorsports's state-law counterclaims. (Doc. 33.) The motion is now fully briefed. (Docs. 37, 39.)

On March 31, 2026, Hearrell, purporting to proceed *pro se*, filed an answer to the counterclaims. (Doc. 40.)[5]

## DISCUSSION

I. Legal Standard

A. **Rule 12(b)(1)**

"A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may attack either the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or the existence of subject matter jurisdiction in fact." *Ader v. SimonMed Imaging Inc.*, 324 F. Supp. 3d 1045, 1048 (D. Ariz. 2018) (internal citation omitted). "Where the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). "The party asserting jurisdiction has the burden of proving all jurisdictional facts." *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

B. **Supplemental Jurisdiction**

28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." "Section 1367 applies to both state-law claims brought by a plaintiff and to state-law counterclaims brought by a defendant." *Nalan v. Access Fin., Inc.*, 2020 WL 6270945, *2 (N.D. Cal. 2020). Counterclaims are part of the same case or controversy when they "derive from a common nucleus of operative fact and are such that a plaintiff

[5] On May 13, 2026, Hearrell's counsel filed a motion to withdraw (Doc. 41), which the Court granted on June 8, 2026 (Doc. 43).

would ordinarily be expected to try them in one judicial proceeding." *Trs. of Constr. Indus. & Laborers Health & Welfare Tr. v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th Cir. 2003) (cleaned up).

"Rule 13 of the Federal Rules of Civil Procedure governs the pleading requirements of counterclaims, and provides that a counterclaim may be either compulsory or permissive." *Nalan*, 2020 WL 6270945 at *2. A counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and "does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1). A permissive counterclaim is "any claim that is not compulsory." Fed. R. Civ. P. 13(b).

In deciding whether a claim is compulsory, the phrase "transaction or occurrence" is "read broadly." *Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1252 (9th Cir. 1987). The Ninth Circuit applies the "logical relationship test" to determine whether the claim is compulsory. *In re Pinkstaff*, 974 F.2d 113, 115 (9th Cir. 1992). The logical relationship test "analyze[s] whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Pochiro*, 827 F.2d at 1249 (citation omitted). "A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1196 (9th Cir. 2005) (citation omitted).

It is well established that if the logical relationship test is satisfied and a counterclaim is compulsory, the "common nucleus of operative fact" requirement is satisfied and § 1367(a) confers jurisdiction. *Ader*, 324 F. Supp. 3d at 1051. There is some uncertainty, however, about whether § 1367(a) also extends jurisdiction over permissive counterclaims under the right circumstances, given that the "case or controversy" language of § 1367 "appears to be broad enough to encompass some permissive counterclaims."

*Campos v. W. Dental Servs., Inc.*, 404 F. Supp. 2d 1164, 1168 (N.D. Cal. 2005). *See also Nalan*, 2020 WL 6270945 at *4 ("The Ninth Circuit has not definitively ruled on the question of whether supplemental jurisdiction under § 1367 can cover permissive counterclaims. However, at least two circuits have held that a federal court may exercise supplemental jurisdiction over certain permissive counterclaims.").

Under § 1367(c), a court may decline to exercise supplemental jurisdiction over a claim or counterclaim if it "raises a novel or complex issue of State law," "substantially predominates over the claim or claims over which the district court has original jurisdiction," "the district court has dismissed all claims over which it has original jurisdiction," or "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." "[A]ctually exercising discretion and deciding whether to decline, or to retain, supplemental jurisdiction over state law claims when any factor in subdivision (c) is implicated is a responsibility that district courts are duty-bound to take seriously." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997). "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the *Gibbs* values 'of economy, convenience, fairness, and comity.'" *Id.* (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, (1966)).

II. <u>The Parties' Arguments</u>

Hearrell moves to "dismiss counts two through seven of" Promotorsports's counterclaims "for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." (Doc. 33 at 2.) Hearrell argues that "[t]here are compelling reasons for the Court to decline to exercise jurisdiction over [Promotorsports's] [c]ounterclaim[s] under 28 U.S.C. § 1367(a)," including that the counterclaims "sound in common law contract and tort theories that are not compulsory and do not have an independent federal basis for federal jurisdiction pursuant to 28 U.S.C. § 1367(c)(4)"; the counterclaims do not "form 'part of the same case or controversy' necessary for the Court to exercise supplemental jurisdiction"; and the counterclaims "would substantially predominate over [Hearrell's]

claims." (*Id.*) Although Hearrell's complaint makes no reference to overtime wages, he confusingly argues that he "seeks unpaid overtime wages under the FLSA and other wages under the AWA." (*Id.* at 5, citing Doc. 33.) Hearrell argues that his "claims will focus on how many hours he worked for [Promotorsports], his regular rate of pay, his commission structure, sales he made, and whether he was paid properly for the work he performed." (*Id.* at 5-6.) Hearrell also argues that his "claims are *purely statutory*, arising exclusively under the aforementioned statutes based on whether [Promotorsports] properly compensated him according to congressional and state minimum wage and wage standards." (*Id.* at 6.) Hearrell argues that Promotorsports, "on the other hand, assert[s] that [he] engaged in unlawful acts, breached a fiduciary duty he owed to [Promotorsports], unjustly enriched himself, converted money and property belonging to [Promotorsports], fraudulently used credit cards, misdirected payments, and breached an oral contract." (*Id.*) Hearrell argues that "[t]he evidence necessary for [Promotorsports] to prove their claims will not include any of the evidence necessary for [Hearrell] to prove his wage claims, which are the hours he worked and the wages he was not paid." (*Id.*) Next, Hearrell argues that "the Court should decline to exercise supplemental jurisdiction" over Promotorsports's "permissive, state law claims" "because there is no independent basis for the Court's jurisdiction over them, and it would be inappropriate for the Court to exercise jurisdiction over them here." (*Id.* at 7.) Hearrell argues that "the only possible nexus between [his] wage claims and [Promotorsports's] [c]ounterclaims is potentially the employment relationship between the two, the mere existence of which is insufficient to establish supplemental jurisdiction over [Promotorsports's] counterclaim." (*Id.* at 8.) "In any event," Hearrell argues that "even if the employment relationship *is* a nexus, the District of Arizona consistently holds that the existence of an employment relationship between plaintiffs and defendants is not sufficient to establish supplemental jurisdiction over a defendant's counterclaims." (*Id.*) Hearrell also argues that "[n]umerous district courts across the nation have also held that they lack supplemental jurisdiction over unrelated

counterclaims in FLSA actions." (*Id.* at 11.)[6] Hearrell argues that Promotorsports's state-law counterclaims "will require a completely separate body of evidence to establish the claims that [Hearrell's] FLSA and Arizona wage claims, and the only possible—albeit unlikely—nexus between the claims is the employment relationship" which "is insufficient." (*Id.*at 12.) Hearrell also argues that Promotorsports's counterclaims "involve different law and evidence and would substantially predominate over [Hearrell's] claims if allowed to proceed." (*Id.*) Next, Hearrell argues that "[e]ven if [Promotorsports's] [c]ounterclaims did fall within the Court's supplemental jurisdiction, the Court should decline to exercise jurisdiction over them pursuant to 28 U.S.C. § 1367(c)(4) because 'there are compelling reasons for declining jurisdiction'"—namely, "allowing the non-wage disputes to color [Hearrell's] wage-related claims would undercut the underlying purposes of the causes of action," "federal FLSA policy presents a compelling reason for the Court to refuse to exercise supplemental jurisdiction," "[c]ourts have been hesitant to permit an employer to file counterclaims in FLSA suits for money the employer claims the employee owes it," and "the courts have demonstrated their disdain for an employer's counterclaims in an FLSA action by finding counterclaims to be retaliatory." (*Id.* at 13-14, cleaned up.)

In response, Promotorsports first argues that its first counterclaim "is based on federal civil RICO statutes and thus is subject to federal question jurisdiction" and that "[f]or this reason alone—that one counterclaim based on the same factual issues as all the others is not subject to dismissal—the Court should deny the Motion to Dismiss, based on supplemental jurisdiction." (Doc. 37 at 2.) Promotorsports argues that "there are no compelling reasons to decline to exercise supplemental jurisdiction" because "[a]llowing the counterclaims to proceed would (1) conserve the parties' monetary resources and promote judicial economy, and (2) avoid litigation of duplicative claims and preclude the potential of inconsistent outcomes." (*Id.* at 3-4.) Promotorsports then reiterates that

---

[6] Hearrell cites *Shearon v. Comfort Tech. Mech. Co., Inc.*, 2014 WL 1330751 (E.D.N.Y. 2014), in support of this contention, but *Shearon* is not an FLSA case, nor does it appear to address subject-matter jurisdiction over *counter*claims. Additionally, *Lyon v. Whisman*, 45 F.3d 758 (3d Cir. 1995), also cited by Hearrell, deals with subject-matter jurisdiction over *the plaintiff's* state-law claims, not over counterclaims.

because "this Court has not dismissed, or been asked to dismiss, the first claim for relief, over which the Court has original jurisdiction," "[t]he Court should exercise supplemental jurisdiction over all state-law counterclaims." (*Id.* at 4.) Specifically, as for the Arizona Unlawful Acts counterclaim, Promotorsports argues that the state "statutes being applied here are largely identical to the federal RICO statutes," and "[a] state law racketeering claim and a federal racketeering claim are the perfect example of two causes of action that 'derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding.'" (*Id.* at 4, citation omitted.) Promotorsports argues that "[t]he allegations in support of the federal and state racketeering statutes require the evaluation and consideration of identical factual issues" and that "Arizona courts have long recognized the connection between state and federal racketeering statutes." (*Id.* at 5.) Promotorsports then argues that "[a]ll of the other six state law counterclaims involve consideration of overlapping and largely identical factual issues, that also form a 'common nucleus' with the federal RICO claim and the Arizona Unlawful Acts claim." (*Id.* at 6.) Promotorsports argues that "[w]ith the First Claim for Relief based on original jurisdiction under the federal RICO statute and the second claim fitting perfectly into the 'common nucleus' standard, it makes no sense that the other counterclaims for relief—all of which arise from the same acts and omissions of the first two counterclaims—should be separated and tried in state court." (*Id.*) Next, Promotorsports appears to argue that the facts underlying its breach of fiduciary duty counterclaim overlap with the facts underlying Hearrell's FLSA claim. (*Id.* at 6-7.) Specifically, Promotorsports argues that the breach of fiduciary duty counterclaim "alleges Hearrell provided services for himself and his LLC, for which he is now seeking compensation" from Promotorsports and that "[t]he factual disputes involve among other things the accuracy and completeness of his timesheets, whether he is seeking compensation from [Promotorsports] for work he performed for himself or his LLC, and whether if he were working on behalf of [Promotorsports] he already has been compensated." (*Id.*) As for the unjust enrichment counterclaim, Promotorsports argues

that "[t]he elements to establish this alternatively pled claim require the same review of evidence and analysis as set forth above and elsewhere herein for the other counterclaims." (*Id.* at 8.) As for the conversion counterclaim, Promotorsports argues that "[t]he analysis for this claim for purposes of supplemental jurisdiction is the same as for unjust enrichment claim specifically, and all other claims more generally." (*Id.* at 9.) As for the fraud counterclaim, Promotorsports again argues the analysis is the same. (*Id.*) As for the breach of the implied covenant of good faith and fair dealing counterclaim, Promotorsports argues that the factual determinations involved "will be made based on the same and similar facts on which the determination is made regarding the federal RICO claim as well as Hearrell's wage claims." (*Id.*) Next, Promotorsports argues that the state-law counterclaims are also compulsory because they require addressing several factual questions that overlap with Hearrell's wage claims—e.g., "Did Hearrell work 40 hours for [Promotorsports]? Did he work any overtime? Was he working for himself or his LLC?" (*Id.* at 10.) Thus, Promotorsports argues that "[a]ll claims and counterclaims arise out of the transaction or occurrence that is the subject of Hearrell's claims." (*Id.*) Next, Promotorsports argues that its counterclaims "allege that Hearrell was rarely if ever actually providing services for them" and will require answering factual questions such as: "[I]s Hearrell claiming entitle[ment] to a minimum wage for hours []he actually worked? Is he seeking overtime for sales that he actually made on behalf of himself or his LLC?" (*Id.*) Promotorsports argues that "[a]ll of these questions go to the very heart of Hearrell's wage claims and the [c]ounterclaims." (*Id.*) Next, Promotorsports argues that "[t]his is not simply a case of Hearrell stealing from [Promotorsports]," but instead, "a fact-finder must determine whether, when Hearrell was performing a task or making a sale, was he doing so on behalf of [Promotorsports]? And did he adopt of form of 'self-help,' reaching out directly to [Promotorsports's customers] to pay himself directly, which would mean (if he actually were acting on behalf of [Promotorsports]) he has been paid." (*Id.* at 10-11.) Promotorsports argues that "[i]f Hearrell paid himself, no wages have been withheld." (*Id.* at 10-11.) And Promotorsports argues that "Hearrell appears to be wanting to be paid

twice, for the same tasks and commissions, once directly from customers and again from [Promotorsports]." (*Id.* at 11 n.3.)

In reply, Hearrell argues that Promotorsports's "response fails to adequately support their assertion that the state law counterclaims qualify as compulsory counterclaims, and the Court should decline to exercise supplemental jurisdiction over them because they will predominate over [Hearrell's] claims for unpaid wages." (Doc. 39 at 1.) Hearrell argues that "[c]ounterclaims two through seven are not compulsory." (*Id.* at 2.) Hearrell argues that, in determining whether counterclaims are compulsory, "[c]ourts consider whether the counterclaims will rely on the same body of evidence required to prove the claims of the complaint," but here, Promotorsports has "not identified any evidence that would be used to support [Hearrell's] claims which would also support their counterclaims." (*Id.*) Next, Hearrell reiterates that there "are compelling reasons to deny supplemental jurisdiction"—mainly, the state-law counterclaims, "if allowed to proceed, would substantially predominate over [Hearrell's] wage claims." (*Id.*) Hearrell argues that "[i]f [Promotorsports's] counterclaims were permitted to remain, this litigation would cease to be about [his] unpaid wages, and it would transform into [Promotorsports's] pursuit of grievances against its former employee." (*Id.* at 3.)

## III. <u>Analysis</u>

As an initial matter, the Court already has subject-matter jurisdiction over this action by virtue of Hearrell's FLSA claim, and there is also an independent basis for jurisdiction over Promotorsports's RICO counterclaim—i.e., federal-question jurisdiction. 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, § 13:29 (June 2026 update) ("Federal Rule of Civil Procedure 13 does not confer subject-matter jurisdiction. Every counterclaim . . . must have a basis for subject-matter jurisdiction. In some cases, *the counterclaim . . . itself might independently fall within the court's subject-matter jurisdiction.* Alternatively, the court may be able to exercise supplemental jurisdiction over the counterclaim . . . under 28 U.S.C.A. § 1367.") (footnote omitted, emphasis added); *id.* at § 13:31 ("Common law ancillary jurisdiction did not extend to permissive counterclaims.

Thus, it was often said that permissive counterclaims had to independently qualify for subject-matter jurisdiction, *such as by being federal questions* or satisfying the requirements of diversity. For the most part, the passage of the supplemental jurisdiction statute has not changed that result.") (footnotes omitted, emphasis added); 6 C. Wright & A. Miller, Federal Practice and Procedure § 1422 (3d ed. Apr. 2026 update) ("[W]hen it is clear that the counterclaim is unrelated to the main transaction and there is some doubt as to the court's power to hear the claim, the court must examine the counterclaim to determine *whether it raises a federal question* or involves diversity of citizenship and the required jurisdictional amount. . . . *When jurisdiction over the original claim stems from the presence of a federal question, the permissive counterclaim*, which by definition does not arise out of the same transaction or occurrence as the original claim, *will need its own basis of jurisdiction, which can be furnished, for example, if it involves some other federal question* or if there is diversity of citizenship.") (footnotes omitted, emphases added). *Cf. Houweling v. Miltner-Vaitys*, 2023 WL 7116625, *1 (E.D. Cal. 2023) (holding that the court had "original federal question jurisdiction over Plaintiff's complaint under 28 U.S.C. § 1331," that "there [was] no independent basis for establishing jurisdiction over Defendant's First Amended Counterclaim because it raises only state law claims between non-diverse parties," and then evaluating whether the court could "exercise supplemental jurisdiction over that counterclaim pursuant to 28 U.S.C. § 1367"); *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1311 (Fed. Cir. 2016) (holding that "where a complaint and a counterclaim both raise issues arising under federal patent law, the district court may retain subject matter jurisdiction over the counterclaim pursuant to 28 U.S.C. § 1338(a)," the patent-law equivalent of § 1331).

Hearrell's extensive efforts to demonstrate that Promotorsports's state-law counterclaims do not arise from the same common nucleus of operative fact as his FLSA claim overlooks that the Court may exercise supplemental jurisdiction over them if they alternatively share a common nucleus of operative fact with Promotorsports's RICO counterclaim. *Cf. Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 814 (9th Cir.

2002) (holding that the district court's "original jurisdiction" over Lozen's counterclaim under the Carmack Amendment "gave it power to exercise supplemental jurisdiction over Lozen's state-law counterclaim" pursuant to 28 U.S.C. § 1367(a)).

The Court in *Williams v. Insomnia Cookies, LLC*, 2025 WL 2062189 (E.D. Mo. 2025), faced a nearly identical issue. There, the plaintiff, Gibson, asserted a claim against the defendants under the FLSA and also asserted various state-law claims. *Id.* at *1. In turn, the defendants asserted five counterclaims against Gibson: (1) violation of the federal Defend Trade Secrets Act; (2) breach of contract; (3) misappropriation of confidential information; (4) violation of the Missouri Uniform Trade Secrets Act; and (5) violation of the Missouri Computer Tampering Act. *Id.* at *2. "Gibson move[d] to dismiss the five counterclaims for lack of subject matter jurisdiction." *Id.* "Analytically, the Court . . . first address[ed] whether Defendants [were] asserting compulsory or permissive counterclaims." *Id.* The court stated that "[t]he distinction between compulsory and permissive counterclaims impacts the Court's analysis because supplemental jurisdiction extends to compulsory counterclaims automatically, while permissive counterclaims must provide an independent basis for the exercise of subject matter jurisdiction." *Id.* (citation omitted). The court held that "[a]part from the employer-employee relationship, Defendants' counterclaims d[id] not have any factual commonality with Gibson's overtime claims or his claims regarding reimbursement of expenses." *Id.* at *3. Therefore, having determined that the "counterclaims [were] permissive," the court held that "there must be an independent basis for jurisdiction." *Id.* The court concluded "that there [was] an independent basis for the Court to exercise federal subject matter jurisdiction for at least one of the counterclaims" because "Counterclaim I arises under the Defend Trade Secrets Act ('DTSA'), a federal statute and, therefore, th[e] Court ha[d] original, federal question jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1331." *Id.* As for the four state-law counterclaims, "[t]he [c]ourt agree[d] with Defendants that the state-law counterclaims all concern the same alleged conduct as the alleged conduct underlying their DTSA claim" and thus held "that the four state-law counterclaims share[d] the same nucleus of operative

facts as the counterclaim over which the Court ha[d] original, federal jurisdiction." *Id.* Accordingly, the Court held that it "may exercise supplemental jurisdiction over" the state-law counterclaims. *Id. See also Pitts v. Fire Extinguisher Sales & Servs. of Arkansas, LLC*, 2022 WL 3241001, *1 n.8 (E.D. Ark. 2022) ("FESSAR's counterclaims were *permissive* counterclaims. The counterclaims thus required an independent basis for subject matter jurisdiction. . . . [T]he sole federal [counter]claim [was] brought pursuant to the Defense of Trade Secrets Act . . . . The Court thus has subject matter jurisdiction over the federal counterclaim. The Court exercises supplemental jurisdiction over FESSAR's 'related' state law [counter]claims."); *Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 583-84 (S.D.N.Y. 2007) ("In contrast to the typical case involving supplemental jurisdiction, in which a defendant brings a state law counterclaim that shares the same 'common nucleus' of facts as the federal claim asserted in the plaintiff's complaint, jurisdiction over Lime Wire's state law counterclaims is predicated on those claims sharing the same 'common nucleus' of facts as its own federal antitrust counterclaims. . . . [T]he factual allegations underlying the record companies' federal copyright claims do not share a 'common nucleus' of operative facts with Lime Wire's remaining state law counterclaims, and thus Lime Wire could not have brought those counterclaims independently in federal court without bootstrapping them to its federal antitrust counterclaims."); *Alpern v. Cavarocchi*, 1999 WL 257695, *12 (E.D. Pa. 1999) ("In addition, my inquiry in this case is not limited to the relationship between the state law counterclaims and Alpern's underlying federal claim. The state law counterclaims must also be analyzed with regard to their relationship to Cavarocchi's federal antitrust [counter]claims. Section 1367(a) does not distinguish between state law counterclaims and other types of state law claims, or between types of claims within the Court's original jurisdiction. It simply asks whether any state law claim is 'so related to claims in the action within [the court's] original jurisdiction' that they form part of the same case or controversy. Thus I consider the state law counterclaims relative to all the federal claims within the Court's original jurisdiction, which is to say both Alpern's ERISA claim and

Cavarocchi's antitrust [counter]claims.")

Promotorsports has asserted a federal RICO counterclaim over which the Court has federal-question jurisdiction (and which Hearrell does not, in any event, move to dismiss). Promotorsports argues that all of its state-law counterclaims share a common nucleus of operative fact with its RICO counterclaim such that the Court may exercise supplemental jurisdiction over them (Doc. 37 at 2), and Hearrell fails to address this point in his reply brief (Doc. 39). But even if Hearrell hadn't forfeited this issue via his silence, the Court agrees with Promotorsports on the merits. The counterclaims allege a set of "Facts Common to All Claims." (Doc. 32 at 3.) In broad strokes, those allegations generally fall into three categories of alleged misconduct: (1) Hearrell performing work for Promotorsports's customers that was supposed to be performed by or on behalf of Promotorsports but for which Hearrell instructed the customers to make payment directly to Hearrell/Wholesale; (2) Hearrell selling products purchased by Promotorsports to Promotorsports's customers and then instructing those customers to make payment for those products to Hearrell/Wholesale instead of Promotorsports; and (3) Hearrell using company credit cards to make unauthorized purchases that benefitted either him personally or Wholesale. (*Id.* ¶¶ 7-38.) Promotorsports's federal RICO counterclaim, and its state-law counterclaims, all rely on this set of common facts. (*See, e.g.*, *id.* ¶¶ 40, 42 [RICO: alleging that Hearrell and Wholesale "used wire fraud to both convince the above-mentioned Promotorsports customers by phone and text messages to send payments that should have been made to Promotorsports to Wholesale" and that "Hearrell, for his personal gain and for the benefit of Wholesale, also used Promotorsports'[s] credit cards without and beyond any legal authorization"]; *id.* ¶¶ 48, 50 [Arizona Unlawful Acts: alleging that Hearrell and Wholesale "used wire fraud to both convince the above-mentioned Promotorsports[] customers by phone and text messages to send payments that should have been made to Promotorsports to Wholesale" and that "Hearrell, for his personal gain and for the benefit of Wholesale, also used Promotorsports'[s] credit cards without legal authorization"]; *id.* ¶¶ 56-57 [Breach of Fiduciary Duty: alleging that

"Hearrell and Wholesale owed to Promotorsports . . . fiduciary duties" and that "[e]ach and every factual allegation alleged herein was a breach of said duty, depriving [Promotorsports] of payments and business opportunities intended for them and instead benefitting Hearrell and Wholesale"]; *id.* ¶ 60 [Unjust Enrichment: alleging that Hearrell and Wholesale "received benefits at the expense of [Promotorsports] through the acts and omissions alleged herein"]; *id.* ¶¶ 65-66 [Conversion: alleging that Promotorsports "had the right to be paid a specific and identifiable amount of money and property in various transactions" and that Hearrell's and Wholesale's "wrongful acts interfered with [Promotorsports's] ability to receive said money and property"]; *id.* ¶ 69 [Fraud: alleging that Hearrell and Wholesale "represented to [Promotorsports] and [Promotorsports's] customers, that he was working for [Promotorsports] and their best interests" which was "false," that Hearrell/Wholesale "used [Promotorsports's] credit cards for their own personal gain," and that Hearrell/Wholesale "misdirected payments for [Promotorsports's] services to themselves"]; *id.* ¶¶ 74-75, 77 [Breach of the Implied Covenant of Good Faith and Fair Dealing: alleging that "Hearrell would perform services, while Wholesale would receive payment for those services," that "there was an implied in fact or oral contract between [Promotorsports] and [Hearrell and Wholesale]," and that Hearrell and Wholesale "breached said covenant by the acts and omissions alleged herein"].)

The only remaining question is whether the Court should decline to exercise supplemental jurisdiction over the state-law counterclaims pursuant to 28 U.S.C. § 1367(c). Hearrell argues that "[e]ven if [Promotorsports's] [c]ounterclaims did fall within the Court's supplemental jurisdiction, the Court should decline to exercise jurisdiction over them pursuant to 28 U.S.C. § 1367(c)(4) because 'there are compelling reasons for declining jurisdiction.'" (Doc. 33 at 13.) Invoking "federal FLSA policy," Hearrell's argument is, in a nutshell, that allowing Promotorsports's state-law counterclaims to proceed would "allow[] the non-wage disputes to color [Hearrell's] wage-related claims," "clutter FLSA proceedings with the minutiae of other employer-employee relationships," and open the door to retaliatory counterclaims "designed to deter claimants

from seeking legal redress." (*Id.* at 13-14, cleaned up.) But none of the cases cited by Hearrell involved exercising supplemental jurisdiction over state-law counterclaims where those counterclaims shared a "common nucleus of operative fact" with an unchallenged federal counterclaim within the court's jurisdiction. Again, *Williams* is instructive. There, the plaintiff "urge[d] the Court to decline to exercise jurisdiction over Defendants' counterclaims. Citing to a number of FLSA cases, [the plaintiff] argue[d] that there is the risk that the counterclaims will predominate over his FLSA claims, and allowing Defendants to go forward with their counterclaims undermines the goals of the FLSA." 2025 WL 2062189 at *4. The court rejected this argument, noting that the FLSA cases cited by the plaintiff were "distinguishable because the counterclaims in th[o]se cases did not arise under federal law." *Id.* The same is true here. Indeed, given that the Court has not dismissed, and has not been asked to dismiss, Promotorsports's federal RICO counterclaim, it would make little sense to require the state-law counterclaims premised on identical facts as that RICO counterclaim to proceed in state court while the RICO counterclaim proceeds in federal court.

Accordingly,

**IT IS ORDERED** that Hearrell's motion to dismiss (Doc. 33) is **denied**.

Dated this 14th day of August, 2026.

Dominic W. Lanza
United States District Judge